**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

MARLENE CAVAGNUOLO,
*as the Executrix of the Estate of*
JOSEPH CAVAGNUOLO,

       Plaintiff,

   v.

ROBERT F. KENNEDY, JR.,
*Secretary of Health and Human Services*,[1]

       Defendant.

</td><td>

Case No. 23-cv-3369-CKK-MJS

</td></tr>
</table>

**REPORT AND RECOMMENDATION**

    This case is about the proper interpretation of the term "covered part D drug" in the Medicare statute. To drill down even more, the parties' competing interpretations hinge largely on the meaning of the word "includes." Under the relevant statute, 42 U.S.C. § 1395w–102(e)(1), a "covered part D drug" is one associated with several characteristics, some in lettered paragraphs and some in an unlettered paragraph that closes out the subsection. The unlettered paragraph is the piece that matters here: "such term *includes* … any use of a covered part D drug for a medically accepted indication[.]" *Id.* (emphasis added). Plaintiff says the word "includes" should be construed in an illustrative, non-exhaustive sense, meaning that drugs used for "medically accepted indications" are *among* those covered by Medicare Part D but *not exclusively so*. The Secretary, on the other hand, says the word "includes" in this context is definitional in nature, meaning that drugs must be used for a "medically accepted indication" to be covered by Medicare Part D. After careful consideration of the statute and the parties' arguments, this Court concludes that the

---

[1] The current Secretary is automatically substituted as the named defendant. Fed. R. Civ. P. 25(d).

Secretary's interpretation wins out. Accordingly, and for the reasons that follow, the undersigned **RECOMMENDS** that the Court **DENY** Plaintiff's motion for summary judgment (ECF No. 14) and **GRANT** the Secretary's cross-motion for summary judgment (ECF No. 16).

## BACKGROUND

I.    **Statutory and Regulatory Framework**

Established by Title XVIII of the Social Security Act ("SSA"), Medicare provides health insurance benefits to the elderly and disabled. 42 U.S.C. §§ 1395, *et seq.* The Secretary of Health and Human Services—through the Centers for Medicare and Medicaid Services—is responsible for administering the Medicare statute, *see* 42 U.S.C. § 1395hh(a)(1), which is divided into four parts. In broad strokes, Parts A provides inpatient hospital insurance benefits, Part B provides medical insurance benefits, and Part C—also known as Medicare Advantage—acts as a coverage alternative that uses a combination of Medicare and private insurance benefits. *See id.* §§ 1395c, 1395j, 1395w–21. Relevant here, Part D, which is the most recent addition to the Medicare regime, deals with prescription drugs. *See id*. § 1395w–101(a)(1).

Medicare Part D was created by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (the "Medicare Modernization Act"), and it allows eligible individuals to enroll in a Medicare-approved private insurance plan for prescription drug coverage. *See* 42 U.S.C. §§ 1395w–101 to –154. For a drug to be covered under Part D, it must fall within the definition of a "covered part D drug" set forth in 42 U.S.C. § 1395w–102(e)(1) ("Section 102(e)(1)"). Through several lettered paragraphs, Section 102(e)(1) enumerates various qualifying criteria for prescription drugs, biological products, insulin, and oral antiviral drugs. *Id.* § 1395w–102(e)(1)(A)–(C). After those lettered paragraphs, Section 102(e)(1) includes a final, unlettered paragraph that reads: "and such term includes a vaccine licensed under section 262 of this title …

and any use of a covered part D drug for a medically accepted indication (as defined in paragraph (4))." *Id.* § 1395w–102(e)(1). Section 102(e)(4), in turn, defines "medically accepted indication" as the term is used in Section 102(e)(1), specifying one definition for drugs "used in an anticancer chemotherapeutic regimen" and a second definition that applies "in the case of any other covered part D drug." *See id.* § 1395w–102(e)(4)(A).

As previewed, the Secretary reads Section 102(e)(1)'s unlettered paragraph as creating a "medically accepted indication" requirement for all covered Part D drugs. The Secretary promulgated implementing regulations to that effect more than two decades ago. *See* Medicare Program; Medicare Prescription Drug Benefit, 70 Fed. Reg 4194, 4534 (Jan. 28, 2005). Those regulations state, in relevant part, that a "Covered Part D drug means—(1) Unless excluded under number (2) of this definition, any of the following if used for *a medically accepted indication* (as defined in section 1927(k)(6) of the [Social Security] Act[.]")  42 C.F.R. § 423.100 (2005) (emphasis added). In connection with the underlying rulemaking for the regulations, the Secretary noted: "The definition of covered Part D drug in § 423.100 of our proposed rule closely followed the statutory definition in [Section 102(e)]," according to which "a covered part D drug was available only by prescription, approved by the Food and Drug Administration (FDA), used and sold in the United States, and used for a medically accepted indication[.]" 70 Fed. Reg. at 4228; *see also id.* at 4261 ("Coverage for other than a medically accepted indication is not permitted under the statute, since such drugs would not be considered Part D drugs.").

3

## II.      Factual and Procedural Background

In 2018, Joseph Cavagnuolo was diagnosed with Stage-IV lung cancer. (ECF No. 25, Joint Appendix ("JA") at 276.)[2] In the course of treatment, Mr. Cavagnuolo's physician discovered he had a "BRCA2 mutation,"[3] which he believed could be treated with the prescription drug Olaparib, sold under the brand name Lynparza. (*Id.* at 70.) The FDA has approved Olaparib to treat other types of cancer—including ovarian, fallopian tube, peritoneal, breast, pancreatic, and prostate cancers (*id.* at 100, 116)—but not lung cancer. So Mr. Cavagnuolo's prescription was considered "off-label." Prescribing drugs for off-label uses is a common and acceptable medical practice left "to the discretion of health care professionals." *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001); *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 534 (6th Cir. 2021) (explaining that federal law "does not prohibit doctors from prescribing an FDA-approved drug (say, a chemotherapy drug approved to treat leukemia) for an 'off-label' use (say, treatment of other cancers)"). But off-label prescriptions implicate coverage questions under Medicare.

As an enrollee in a Medicare-approved healthcare plan, Mutual of Omaha Rx ("the Plan"), Mr. Cavagnuolo sought preapproval of Olaparib to confirm coverage under Medicare Part D. (JA at 99.) The Plan denied the request because the FDA had "not approved the use of the requested medication for the diagnosis provided" and the use was not "listed in any of the clinical resources [*i.e.*, compendia] approved … for use in evaluating Part D coverage." (*Id.* at 99–100, 108–09.) Mr. Cavagnuolo then sought review of the Plan's decision from the applicable independent review organization, which upheld the Plan's denial of coverage on the same basis. (*Id.* at 52–55.)

---

[2] Page citations to the JA refer to the bolded running pagination at the bottom middle of each page. Page citations to the parties' briefing, by contrast, refer to those assigned by the Court's electronic filing system.

[3] "*BRCA2* is a gene that prevents and fights cancer," so a mutation in the gene can increase people's risk of certain types of cancer. *See BRCA2*, Cleveland Clinic (Jan. 27, 2026), https://perma.cc/K9DL-7H8X.

From there, Mr. Cavagnuolo appealed the denial to an administrative law judge ("ALJ"), arguing that (1) medical literature supported the use of Olaparib to treat lung cancer and (2) the regulations imposing a compendia requirement were unlawful because the final paragraph in Section 102(e)(1) was not intended by Congress to limit which drugs were covered. (*See id.* at 116–22.) The ALJ disagreed and upheld the Plan's coverage determination. (*Id.* at 219–20.) Most significantly, the ALJ explained that "[l]ung cancer is not noted as covered in the compendia." (*Id.* at 219.) And that mattered because the ALJ found that Section 102(e)(1) "clearly and unambiguously limit[ed] the definition of a" covered Part D drug to those being used for a medically accepted indication, meaning one approved by the FDA or "supported by one or more citations" in one of the Part D specified compendia. (*Id.* at 219–20.) Accordingly, the ALJ found that "the Plan [was] not required to cover [Olaparib] under Part D." (*Id.* at 220.)

Mr. Cavagnuolo next appealed the ALJ's decision to the Medicare Appeals Council. (*Id.* at 223–24.) Over the next two-and-a-half years, the Council twice remanded back to the ALJ for reasons not particularly relevant here, but which were assuredly frustrating to Mr. Cavagnuolo and his family. (*Id.* at 223–24, 246–48.) During that time, Mr. Cavagnuolo sadly passed away, and his wife, Marlene Cavagnuolo, began to execute the estate and pursue appeals on its behalf. (*Id.* at 233.) After the second remand from the Council, the ALJ issued a final decision in November 2022, adopting most of the same analysis as before and finding, once again, that Mr. Cavagnuolo's prescription for Olaparib was not covered by Medicare Part D because it was not prescribed for a medically accepted indication. (*Id.* at 26–31.) The Council upheld the decision. (*Id.* at 6–8.)

At that point, Mrs. Cavagnuolo—on behalf of her late husband's estate—turned to the federal courts. She filed this lawsuit seeking a declaratory judgment and relief under the Medicare Modernization Act, 42 U.S.C. § 1395w–101, and the Administrative Procedure Act ("APA"), 5

U.S.C. § 706. (ECF No. 1 ¶¶ 41–58.) Mrs. Cavagnuolo has since moved for summary judgment, raising "a single statutory-construction issue" by arguing that Section 102(e)(1) does not impose a medically accepted indication requirement on covered Part D drugs. (ECF No. 14-1 ("Pl.'s Mem.") at 10.) Meanwhile, the Secretary filed a cross-motion for summary judgment, advocating the opposite reading of the statute and defending the denial of coverage. (ECF No. 16-1 ("Def.'s Mem.").) Earlier this year, Judge Colleen Kollar-Kotelly referred the dueling summary-judgment motions to the undersigned (*see* ECF No. 28), which are fully briefed and ripe for decision (*see* ECF No. 19 ("Pl.'s Reply"); ECF No. 24 ("Def.'s Reply")).

**LEGAL STANDARDS**

Plaintiff brings this action under both the Medicare statute and the APA. Appeals under the Medicare statute are governed by the same standard applicable to Social Security appeals under 42 U.S.C. § 405(g). *See* 42 U.S.C. §§ 1395w–104(h), 1395w–22(g)(5); *see also Action All. of Senior Citizens v. Leavitt*, 483 F.3d 852, 860 (D.C. Cir. 2007). In keeping with that standard, the Secretary's decision "will not be disturbed if it is based on substantial evidence in the record and correctly applies the relevant legal standards." *Cox v. Kijakazi*, 77 F.4th 983, 990 (D.C. Cir. 2023) (quoting *Butler v. Barnhart*, 353 F.3d 992, 999 (D.C. Cir. 2004)). Stated differently, the agency's factual determinations are generally owed certain deference, while the Court reviews *de novo* any questions about whether the agency applied the proper legal standards. *See id.*

Under the APA, the Court will "compel agency action unlawfully withheld or unreasonably delayed," or set aside actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(1), 706(2)(A). An agency's decision is arbitrary and capricious if it "relied on factors which Congress has not intended it to consider," *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1110 (D.C. Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n v. State*

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)), or if it is "based on an unlawful interpretation of [a] statute," *Evangelical Comm. Hosp. v. Becerra*, 2022 WL 4598546, at *3 (D.D.C. Sept. 30, 2022) (citing *FCC v. Nat'l Citizens Comm. For Broad.*, 436 U.S. 775, 803 (1978)).

## ANALYSIS

Despite the surface-level complexities associated with this case—not least of all, the labyrinthine nature of Medicare's statutory regime—the crux of the dispute is relatively simple. There is no disagreement about the key facts: all agree that Mr. Cavagnuolo's use of Olaparib to treat lung cancer was "off-label" and so was not used for a "medically accepted indication" as described in the statute. The debate, instead, is about whether Congress embedded a "medically accepted indication" requirement in the statute at all. As the parties frame that debate, it comes down to whether the term "includes" in the last paragraph of Section 102(e)(1) is properly read in an illustrative sense, as Plaintiff urges, or in a definitional sense, as the Secretary rejoins.

To resolve that question, the Court must interpret for itself the statutory language at issue. In doing so, the Court is not breaking new ground. Nearly a dozen other federal courts have addressed this same issue—some in a more full-throated sense, others in a more abbreviated fashion—and all but one have held that the plain text of Section 102(e)(1) contains a "medically accepted indication" requirement for Part D coverage notwithstanding the use of the term "includes" to introduce the concept. *See Kilmer v. Leavitt*, 609 F. Supp. 2d 750, 755 (S.D. Ohio 2009); *U.S. ex rel. Fox RX, Inc. v. Omnicare, Inc.*, 2012 WL 8020674, at *9 (N.D. Ga. Aug. 29, 2012); *Rickhoff v. Sec'y of HHS*, 2012 WL 6177411, at *1 (D. Ariz. Dec. 11, 2012); *Nievod v. Sebellius*, 2013 WL 503089, at *10 (N.D. Cal. Feb. 8, 2013); *Diamond v. Sec'y of HHS*, 2015 WL 367010, at *6 (N.D. Ohio Jan. 27, 2015); *Broome v. Burwell*, 2015 WL 1526532, at *4 (D. Or. Apr. 1, 2015); *Roeder v. Burwell*, 197 F. Supp. 3d 887, 892 (E.D. Va. 2016); *United States ex rel. Brown*

7

*v. Celgene Corp.*, 226 F. Supp. 3d 1032, 1048 (C.D. Cal. 2016); *Brew v. Burwell*, 263 F. Supp. 3d 431, 435–36 (W.D.N.Y. 2017); *Case v. Azar*, 2019 WL 1261417, at *5 (M.D.N.C. Jan. 3, 2019), *report and recommendation adopted*, 2019 WL 1597003 (M.D.N.C. Apr. 15, 2019); *Bruce v. Azar*, 424 F. Supp. 3d 714, 719 (N.D. Cal. 2019), *aff'd*, 826 F. App'x 643 (9th Cir. 2020).[4] *But see Layzer v. Leavitt*, 770 F. Supp. 2d 579, 587 (S.D.N.Y. 2011) (reaching the opposite conclusion). Perhaps the most discussed analysis on the issue comes from Judge Saundra Brown Armstrong's decision in *Nievod*, 2013 WL 503089. In keeping with several other courts, the undersigned likewise finds *Nievod*'s reasoning persuasive, and for many of the same reasons, it reaches the same conclusion today: the plain text of Section 102(e)(1), when read as a whole and in context, means that covered part D drugs must be used for a "medically accepted indication" under the statute.

The Court starts by outlining why its own analysis of the statute largely accords with the reasoning articulated in *Nievod*—and reinforced by several additional cases since—before explaining why Plaintiff's remaining counterarguments fail to persuade otherwise.

## I.      Interpreting Section 102(e)(1)'s Plain Meaning

The Court begins, as it must, with the statutory text. *See Van Buren v. United States*, 593 U.S. 374, 381 (2021). Section 102(e)(1) reads in full:

[T]he term "covered part D drug" means—

(A) a drug that may be dispensed only upon a prescription and that is described in subparagraph (A)(i), (A)(ii), or (A)(iii) of section 1396r–8(k)(2) of this title;

(B) a biological product described in clauses (i) through (iii) of subparagraph (B) of such section or insulin described in subparagraph (C) of such section and medical

---

[4] Similarly, in *U.S. ex rel. Polansky v. Pfizer Inc.*, the Second Circuit considered a potential violation of the False Claims Act stemming from the alleged marketing of a drug for off-label use. 822 F.3d 613 (2d Cir. 2016). The court did not parse Section 102(e)(1) but assumed the existence of an on-label and compendia requirement. *See id.* at 615 ("Federal reimbursements for prescription drugs under Medicare and Medicaid is generally limited to drugs prescribed for FDA-approved (on-label) use or for certain purposes included in any of three drug compendia.") (citing 42 U.S.C. § 1395w–102(e)(1), (4)).

supplies associated with the injection of insulin (as defined in regulations of the Secretary); or

(C) for the period beginning on December 29, 2022, and ending on December 31, 2026, an oral antiviral drug that may be dispensed only upon a prescription and is authorized under section 360bbb–3 of title 21, on the basis of the declaration published in the Federal Register by the Secretary of Health and Human Services on April 1, 2020 (85 Fed. Reg. 18250 et seq.),

and *such term includes* a vaccine licensed under section 262 of this title (and, for vaccines administered on or after January 1, 2008, its administration) and *any use of a covered part D drug for a medically accepted indication* (as defined in paragraph (4)).

42 U.S.C. § 1395w–102(e)(1) (emphases added).

In construing Section 102(e)(1) as a whole, there are several indicators that Congress intended the language in the final paragraph to operate as additional definitional elements of the term "covered part D drug," rather than as a mere illustration of a few examples that fit within the preceding definitional elements captured by the earlier paragraphs.

Start with the text itself and its structure. *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 61 (D.C. Cir. 2014) ("[R]eliance on the text and its structure to discern congressional intent is a well-recognized method of statutory interpretation."). The statute's definition comprises four paragraphs, and in connecting those paragraphs, Congress opted to use different terms in different places. The three lettered paragraphs are separated by the word "or," which generally reflects a disjunctive interpretation—*i.e.*, "alternative uses" that can be "treated separately." 1A Shambie Singer and Norman Singer, Sutherland on Statutory Construction § 21:16 (8th ed.); *Chao v. Day*, 436 F.3d 234, 236 (D.C. Cir. 2006). In other words, the use of "or" indicates that a "covered part D drug" can *either* be (A) "a drug that may be dispensed only upon a prescription," *or* (B) "a biological product" *or* "insulin," *or* (C) "an oral antiviral drug that may be dispensed only upon a prescription." 42 U.S.C. § 1395w–102(e)(1)(A)–(C). Only one of those criteria—not all three at once—must be met. But then Congress separated the final paragraph differently, with the term

9

"and"—*i.e.*, "and such term includes…"—a word typically used "where a statute contains two or more requirements" that "all must be fulfilled in order to comply with the law." 1A Sutherland § 21:16; *In re Flyers Rts. Educ. Fund, Inc.*, 61 F.4th 166, 168 (D.C. Cir. 2023). The contrasting use of "and" signals that Congress meant to impose *additional* definitional elements to supplement the earlier paragraphs, as several other courts have previously concluded. *See, e.g.*, *Nievod*, 2013 WL 503089, at *10 ("The use of the conjunctive 'and' connotes that the [final] paragraph was intended by Congress to impose *additional* conditions on the [] preceding paragraphs[.]"); *Kilmer*, 609 F. Supp. 2d at 754 (similar).

More, the broader statutory context of Section 102(e)(1) is consistent with a definitional, rather than illustrative, reading of the final paragraph's "medically accepted indication" language. Take paragraph (A). It defines a qualifying "drug" by way of a cross-reference to the definition of a "covered outpatient drug" set forth in 42 U.S.C. § 1396r–8(k)(2), and covered outpatient drugs are all subject to a medically accepted indication requirement.[5] In other words, all the covered drugs cross-referenced in Section 102(e)(1)(A) must satisfy a medically accepted indication requirement. An illustrative reading of the final paragraph of Section 102(e)(1) would be incongruous with the earlier definitional language incorporated into paragraph (A)—essentially allowing coverage of drugs used for non-medically accepted indications despite the preceding limitation to the contrary. *See Nievod*, 2013 WL 503089, at *7; *see also, e.g.*, *Brew*, 263 F. Supp. 3d at, 435 (similar).[6]

---

[5] *See* 42 U.S.C. § 1395w–102(e)(1)(A) ("[A] drug that may be dispensed only upon a prescription and that is described in subparagraph (A)(i), (A)(ii), or (A)(iii) of section 1396r–8(k)(2) of this title."); *see id.* § 1396r–8(k)(2) ("Subject to the exceptions in paragraph (3), the term 'covered outpatient drug' means …"); *id.* § 1396r–8(k)(3) (explaining that "covered outpatient drug" "does not include … a drug or a biological used for a medical indication which is not a medically accepted indication").

[6] Because Section 102(e)(1) only explicitly cross-references 42 U.S.C. 1396–8(k)(2), but not –8(k)(3), Plaintiff argues that the Court should not read the latter as incorporated into Section 102(e)(1). (*See* Pl.'s Mem. at 26.) But as the Secretary responds (Def.'s Mem. at 35–36), Section 1396r–8(k)(2) expressly states

Other statutory context supports this construction. Paragraph (B) similarly defines "biological product" by cross-reference to the definition of "covered outpatient drug" in 42 U.S.C. § 1396r–8(k)(2), and that cross-referenced section excludes vaccines from the ambit of a "biological product."[7] Yet the last paragraph of Section 102(e)(1)—which Plaintiff says is merely illustrative in nature—says that a covered part D drug "includes a vaccine licensed under Section 262 of this title (and, for vaccines administered on or after January 1, 2008, its administration)[.]" *Id.* § 1395w–102(e)(1). But as another court succinctly put it, "[a] vaccine cannot 'illustrate' Subsection 102(e)(1)(B)'s definition of biological products" when "[v]accines are, in fact, specifically excluded from that definition[.]" *Roeder*, 197 F. Supp. 3d at 891; *see also Nievod*, 2013 WL 503089, at *8 ("[I]t would be illogical to construe the reference to vaccines [in the last paragraph of Section 102(e)(1)] as nothing more than an example of what could be covered under Part D, when, in the preceding paragraphs, vaccines are expressly excluded."). Instead, the better interpretation is that the last paragraph was meant to ensure certain types of vaccines would be covered despite paragraph (B)'s general exclusion of vaccines from "biological products."

Finally, the Court finds it significant that Congress chose to include a detailed definition of "medically accepted indication" as part of the same statutory section in which the term is used. 42 U.S.C. § 1395w–102(e)(4). In fact, there are two different definitions depending on the use of the drug: a slightly broader definition that applies to the case of a drug "used in an anticancer

---

that its definitions are "[s]ubject to the exceptions in paragraph (3)," *see* 42 U.S.C. § 1396r–8(k)(2), and it would make little sense to incorporate that definition while excluding the exceptions that are baked into it. In fact, one court found a "medically accepted indication" requirement in Section 102(e)(1) based solely on paragraph (A) and its cross-referenced provisions, without even reaching the meaning of Section 102(e)(1)'s final paragraph. *See Brown*, 226 F. Supp. 3d 1032, 1047–48.

[7] *See* 42 U.S.C. § 1395w–102(e)(1)(B) ("[A] biological product described in clauses (i) through (iii) of subparagraph (B) of such section [1396r–8(k)(2) of this title]"); *id.* § 1396r–8(k)(2)(B) (defining "covered outpatient drug" to include "a biological product, *other than a vaccine* …") (emphasis added).

chemotherapeutic regimen," borrowed from Medicare Part B, and another narrower definition that applies "in the case of any other covered part D drug." *See id.* § 1395w–102(e)(4)(i), (ii).[8] Courts should attempt to construe a statute to give meaning to all its constituent parts and to avoid surplusage. *See Corley v. United States*, 556 U.S. 303, 314 (2009) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.") (cleaned up); *see also Radio Commc'ns Corp. v. FCC*, 141 F.4th 243, 250 (D.C. Cir. 2025) (similar). If Congress intended the "medically accepted indication" language of Section 102(e)(1) as merely an example category of drugs that qualify for coverage under Part D—alongside drugs used for a non-medically accepted indication—there would be no need to include a detailed definition of that term within the same statutory subsection because it would not matter whatsoever whether a drug was used for a "medically accepted indication." More, Congress amended Section 102(e)(4) since its original enactment, to create these definitional distinctions for different drug uses. *See* Pub. L. No. 110–275, § 182, 122 Stat. 2494, 2583 (2008). As another court observed, "when Congress revised the statute in this manner, it viewed 'medically accepted indication' as a limit on coverage: there would have been no need to broaden the more limited compendia requirement for anti-cancer drug uses if there were no 'medically accepted indication' requirement in the first place." *Roeder*, 197 F. Supp. 3d at 891. Thus, to give Section 102(e)(4) independent meaning, the proper reading is to construe the term "medically accepted indication" as a specific limitation on coverage in Section 102(e)(1), not merely an example of it. *Nievod*, 2013 WL 503089, at *8–9; *see also Broome*, 2015 WL 1526532, at *4 (similar).

---

[8] The broader definition in Medicare Part B permits the use of certain "peer reviewed medical literature" in considering whether a drug's use has a "medically accepted indication," 42 U.S.C. § 1395x(t)(2)(B)(ii)(II), rather than limiting that inquiry to specified compendia, as applicable here.

12

For these reasons, certainly when considered collectively and in context, the Court agrees with the Secretary's reading of Section 102(e)(1) as imposing a "medically accepted indication" requirement for coverage under Medicare Part D.

## II.    Plaintiff's Interpretative Arguments to the Contrary

### A.    An Illustrative Reading of "Includes"

Plaintiff's principal argument in resisting this outcome focuses on the term "includes" in the final paragraph of Section 102(e)(1): "and such term *includes* … any use of a covered part D drug for a medically accepted indication[.]" 42 U.S.C. § 1395w–102(e)(1) (emphasis added). Plaintiff says "includes" must be read illustratively and not as a limitation (Pl.'s Mem. at 24–25; Pl.'s. Reply at 10–11) because the general definitional section in the Social Security Act—which encompasses the Medicare statute(s) at issue here—defines "includes" in this way: "The terms 'includes' and 'including' when used in a definition contained in this chapter shall not be deemed to exclude other things otherwise within the meaning of the term defined." 42 U.S.C. § 1301(b). Although the Court understands the superficial appeal of that theory, it fails to the carry the day.

It is certainly true that "the word 'include' can signal that the list that follows is meant to be illustrative rather than exhaustive." *Samantar v. Yousuf*, 560 U.S. 305, 317 (2010) (citing 2A Sutherland § 47.7); *Dong v. Smithsonian Inst.*, 125 F.3d 877, 880 (D.C. Cir. 1997) ("We recognize … that the word 'includes' normally does not introduce an exhaustive list but merely sets out examples of some 'general principle.'"). But that is not always so. The word "'includes' … can also introduce restrictive or definitional terms." *Adams v. Dole*, 927 F.2d 771, 776–77 (4th Cir. 1991); *cf. Cashman v. Dolce Int'l/Hartford, Inc.*, 225 F.R.D. 73, 84 (D. Conn. 2004) ("[T]he word "include[es]" need not always be used by Congress in an illustrative manner."). To make this determination, the surrounding context matters. *FCC v. Consumers' Research*, 606 U.S. 656, 684

(2025) (reiterating that courts do not "examine … statutory phrases in isolation but instead look[] to the broader statutory context[]"). And here, for the reasons just explained, the overall statutory context indicates that the term "includes" as used in the final paragraph of Section 102(e)(1) was meant to be read—as other courts have held—definitionally, and not illustratively. *See, e.g.*, *Roeder*, 197 F. Supp. 3d at 891 (agreeing that "'includes' was meant to be definitional, not illustrative," given the statutory context surrounding Section 102(e)(1)); *Nievod*, 2013 WL 503089, at *7 (same); *Fox*, 2012 WL 8020674, at *8 (same); *Kilmer*, 609 F. Supp. 2d at 754 (same).

The broader statute's default definition of "includes" does not change this reality. A statutory definition is certainly a relevant datapoint in the interpretative analysis, but not necessarily the be-all and end-all. This is because "a statutory term—*even one defined in the statute*—'may take on distinct characters from association with distinct statutory objects calling for different implementation strategies.'" *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 320 (2014) (emphasis added) (rejecting argument that an "Act-wide definition" controlled no matter the specific setting in which the term was used). After all, "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Id.* (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)). And again, the broader context of the word "includes" in the final paragraph of Section 102(e)(1) reveals that Congress intended to use the term differently than the statute's default definition of the term would suggest.

Simply put, Plaintiff's preferred reading of "includes" as used in Section 102(e)(1)—and Plaintiff's associated reliance on the outlier *Layzer* case, 770 F. Supp. 2d 759—cannot carry the day. The statutory text, when read as a whole and in context, precludes an illustrative reading of "includes" and instead reflects that Congress intended the "medically accepted indication" language to serve as an additional definitional element of "covered part D drug."

14

### B.      Plaintiff's Reliance on *Loper Bright*

Plaintiff next says the Court should eschew any reliance on the prior cases construing Section 102(e)(1) in the manner proposed by the Secretary because those earlier cases were decided, at least in part, under the now-overruled *Chevron* regime. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)*, overruled by Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024). Under *Chevron*, courts applied "a two-step framework to interpret statutes administered by federal agencies." *Loper Bright*, 603 U.S. at 379. At the first step, courts asked "whether Congress ha[d] directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. If so, and if Congress's intent was "clear," that was the end of the inquiry. *See id.* at 842–43. But "if the statute [was] silent or ambiguous with respect to the specific issue," then courts moved to *Chevron*'s second step and asked "whether the agency's answer [was] based on a permissible construction of the statute." *Id.* at 843. In doing so, courts were to give "considerable weight" and "deference" to the agency's interpretation. *Id.* at 844. Broadly speaking, *Loper Bright* overruled that two-step framework, clarifying that courts retain the task of interpreting statutes, "no matter the context, based on the traditional tools of statutory construction, not individual policy preferences." *Loper Bright*, 603 U.S. at 403. So now, courts "may not defer to an agency interpretation of a law simply because a statute is ambiguous." *Id.* at 413.

The reason *Loper Bright* is no help to Plaintiff, though, is that most of the prior cases interpreting Section 102(e)(1) never reached the second *Chevron* step (or reached it only in the alternative) because those courts concluded, as a threshold matter, that the plain meaning of the statute was clear. *See Nievod*, 2013 WL 503089, at *9–10 ("While the statute at issue certainly is not a model of clarity, the Court has determined that there is no ambiguity as to whether a covered Part D drug must be used for a medically accepted indication."); *Roeder* 197 F. Supp. 3d at 889

15

("The Court need look no further than the plain language of Section 102(e)(1)[.]"); *Bruce*, 424 F. Supp. 3d at 719 (similar); *Fox*, 2012 WL 8020674, at \*9 (similar); *Case*, 2019 WL 1261417, at \*5 (similar). Those plain-meaning-focused holdings were in no way upset by *Loper Bright*. And similarly, this Court reaches its decision based on its independent interpretation of the plain meaning of the Section 102(e)(1) without any considerations of deference to the Secretary.

### C.       Plaintiff's Remaining Interpretive Arguments

Plaintiff invokes several interpretative canons to support her preferred reading. First, she says that because Medicare—and the Social Security Act more broadly—is remedial in nature, the Court should construe its terms liberally to effectuate its remedial purpose. But even accepting Plaintiff's characterization, "[t]he purpose of a statute, even if remedial, cannot overcome the plain meaning of the statute's text." *Young v. United States*, 943 F.3d 460, 464 (D.C. Cir. 2019).

Plaintiff additionally points to the canon of *in pari materia*, which "reflects the basic principle that courts should read related bodies of law as a consistent and coherent whole." *Med. Imaging & Tech. All. v. Libr. of Cong.*, 103 F.4th 830, 837 n.2 (D.C. Cir. 2024). As Plaintiff sees it, the Court should read the "medically accepted indication" element of Medicare Part D consistently with the "medically accepted indication" requirement of Medicare Part B, which allows consideration of "peer reviewed literature" in addition to the compendia. (Pl.'s Mem. at 27–28.) But the flaw in this argument is that Congress itself drew those distinctions in crafting separate and specific definitions for separate parts of the Medicare regime (*see supra* at 12 n.8), and the Court cannot resort to a general interpretative canon to frustrate those clear statutory distinctions.

Plaintiff relies, moreover, on the general proposition that statutes should be construed "to avoid untenable distinctions and unreasonable results," including the sort of situation created here, whereby Olaparib would be covered for use in treating some forms of cancer but not others. (Pl.'s

16

Mem. at 28–29 (citing *Amer. Tobacco Co. v. Patterson*, 456 U.S. 63, 71 (1982)).) The Court is not unsympathetic to that point, but it is really an argument grounded in policy considerations, not legal ones. And this Court must apply the law as written by Congress, "based on the traditional tools of statutory construction, not individual policy preferences." *Loper Bright*, 603 U.S. at 403.

Finally, Plaintiff points to the canon of *expressio unius est exclusio alterius*, which stands for the principle that "the mention of one thing implies the exclusion of another." *Layzer*, 770 F. Supp. 2d at 586. Beyond describing that canon, though, Plaintiff fails to meaningfully explain how it might apply here. At most, Plaintiff seems to be suggesting that because Section 102(e)(2) sets forth specific exclusions from Section 102(e)(1)'s definition of "covered part D drug," the Court should not read an additional exclusion into statute in the form of a "medically accepted indication" requirement. But the "medically accepted indication" language is not an exclusion from the definition; given its placement in Section 102(e)(1), it is part of the definition itself. Plaintiff's attempt to recast that definitional language as an exclusion misses the mark.

## III.    Tying Up Plaintiff's Claims

Because Plaintiff's Medicare and APA claims are all premised on an illustrative reading of Section 102(e)(1)'s last paragraph (*see* Pl.'s Mem. at 31–33), they are foreclosed by the Court's findings above. As to the Medicare claim, the Secretary's decision here properly applied the legal standards established by statute. And as to the APA claims, the Secretary's actions were not arbitrary or capricious but rather adhered to the law as written by Congress and as properly incorporated by the Secretary into the relevant implementing regulations.

Last, Plaintiff separately presses an argument that the use of a compendia requirement in defining "medically accepted indication" for purposes of Section 102(e)(1) amounts to an unlawful subdelegation of agency authority. (Pl.'s Mem. at 33–34; Pl.'s Reply at 14–16.) This theory springs

17

from the premise that "[w]hen Congress confers regulatory authority on an agency, subdelegation of that authority 'to outside parties [is] assumed to be improper absent an affirmative showing of congressional authorization.'" *Int'l Dark-Sky Ass'n v. FCC*, 106 F.4th 1206, 1215 (D.C. Cir. 2024) (quoting *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004)). But as the Secretary rightly rejoins, there is no subdelegation problem here because Congress not only expressly *authorized*, but expressly *mandated*, that the Secretary utilize the compendia in assessing whether a drug's use is for a medically accepted indication. *See* 42 U.S.C. §§ 1395w–102(e)(4)(a)(i)(II), (e)(4)(c); *see also id.* § 1396r–8(k)(6); *id.* § 1396r–8(g)(1)(B)(i).[9]

## CONCLUSION AND RECOMMENDATION

The Court acknowledges the deeply distressing circumstances that serve as the backdrop to this dispute. Like far too many families in far too many situations, the Cavagnuolo family was thrust into an unexpected battle with cancer—circumstances that are overwhelming enough in their own right without having to simultaneously worry about whether certain treatments will be covered by insurance. At the same time, the Court is constrained to apply the law as written by Congress. And for the reasons explained, the governing statutory regime here precludes coverage for Mr. Cavagnuolo's prescribed use of Olaparib under Medicare Part D because it was not prescribed for a medically accepted indication as defined by the statute.

---

[9] Plaintiff separately suggests that any subdelegation must be limited to one of three circumstances: "(1) establishing a reasonable condition for granting federal approval; (2) fact gathering; and (3) advice giving." (Pl.'s Mem. at 33–34 (citing *Int'l Dark-Sky Ass'n*, 106 F.4th at 1215–16).) But that misreads precedent. Instead, the D.C. Circuit has explained that those categories of "third-party involvement in the regulatory process" can be legitimate even absent a showing of congressional authorization. *Int'l Dark-Sky Ass'n*, 106 F.4th at 1215–16; *U.S. Telecom Ass'n*, 359 F.3d at 556–68 (explaining that those types of "outside party input" are separate circumstances that "do not involve subdelegation"). Accordingly, because Congress expressly authorized the use of the compendia, this Court need not decide whether their use in the context at issue here falls within one of the three categories referenced above.

The undersigned thus **RECOMMENDS** that the Court **DENY** Plaintiff's motion for summary judgment (ECF No. 14) and **GRANT** the Secretary's cross-motion (ECF No. 16).


Dated: June 18, 2026

                                                           MATTHEW J. SHARBAUGH
                                                             United States Magistrate Judge

\*　　\*　　\*

The Court hereby advises that, pursuant to 28 U.S.C. § 636(b)(1)(C) and LCvR 72.3(b), any party who objects to a report and recommendation must file a written objection within fourteen (14) days of the party's receipt of the report and recommendation. The written objections must specifically identify the portion of the report and recommendation to which objection is made and the basis for such objections. Failure to file timely objections to the findings and recommendations set forth in this report may waive that party's right of appeal from an order of the District Court that adopts such findings and recommendations. *See Thomas v. Arn*, 474 U.S. 140 (1985).